IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 112,511

In the Matter of LAURENCE M. JARVIS,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed May 1, 2015. Indefinite suspension.

*Alexander M. Walczak*, Deputy Disciplinary Administrator, argued the cause and was on the brief for the petitioner.

*Laurence M. Jarvis*, respondent, argued the cause and was on the brief pro se.

*Per Curiam*: This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Laurence M. Jarvis, of Leawood, an attorney admitted to the practice of law in Kansas in 1969.

On March 24, 2014, the office of the Disciplinary Administrator filed a formal complaint against the respondent, alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent filed an answer on April 7, 2014. A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on June 25-26, 2014, where the respondent was personally present; he was not represented by counsel. The hearing panel determined that respondent violated KRPC 1.1 (2014 Kan. Ct. R. Annot. 456) (competence); 1.3 (2014 Kan. Ct. R. Annot. 475) (diligence); 1.7(a)(2) (2014 Kan. Ct. R. Annot. 531) (conflict of interest); 1.8(e) (2014 Kan. Ct. R. Annot. 542) (providing financial assistance to client); 8.4(c) (2014 Kan. Ct. R. Annot. 680) (engaging

1

in conduct involving misrepresentation); and 8.4(d) (2014 Kan. Ct. R. Annot. 680) (engaging in conduct prejudicial to the administration of justice).

Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

"*Findings of Fact*

. . . .

"DA10466 and DA10620

"8.     On March 14, 2008, the Honorable Janice D. Russell filed a complaint against the respondent regarding his representation of B.A. in 06CV1487. Additionally, on September 10, 2008, Gregory V. Blume, an attorney practicing in Overland Park, Kansas, filed a complaint against the respondent regarding his representation of B.A. in 06CV1487.

"9.     Following the investigation of the disciplinary complaints, the review committee of the Kansas Board for Discipline of Attorneys approved the respondent's participation in the attorney diversion program.

"10.     On May 17, 2011, the respondent and the disciplinary administrator entered into a diversion agreement. Thereafter, the respondent failed to comply with the terms and conditions of diversion. The respondent's non-compliance with the diversion agreement was reported to the review committee which revoked the diversion agreement. The disciplinary administrator notified the respondent of the revocation of his diversion agreement, by letter dated March 19, 2014.

"11.     The diversion agreement included the following stipulations.

2

'8. The Disciplinary Administrator and the Respondent stipulate to the following facts:

a. The complaint in this case was filed by District Court Judge Janice D. Russell.

b. In February of 2006, the respondent represented the defendant, [B.A.], in an action for a [*sic*] specific performance of a contract for deed. The case was filed in Judge Russell's division.

c. The defendant was served with summons on March 9, 2006. No answer was filed. The respondent appeared at a default hearing and Judge Russell allowed the respondent to file an answer and counterclaim out of time. The respondent did file an answer and counterclaim.

d. The respondent failed to appear at a pre-trial conference despite receiving notice of that proceeding. A trial date was set for July 18, 2006.

e. The respondent did not appear at the trial on July 18, 2006. The respondent had received notice of that trial. The court called the respondent and he did not respond to that call. Judgment was entered against respondent's client in the amount of $78,919.83.

f. On August 24, 2006, the respondent filed a motion for the appointment of an accountant and special master. A hearing was set for October 13, 2006, on that motion. The respondent or [*sic*] his client failed to appear.

g. On December 19, 2006, the respondent appeared at a motion to enforce orders entered [*sic*] that had been entered on July 18, 2006. Nothing had been done by the respondent to set aside the orders entered on July 18, 2006.

h. On May 17, 2007, the respondent wrote opposing counsel and advised that he intended to appeal the judgment entered on July 18, 2006. No notice of appeal was ever filed by the respondent.

i. On November 13, 2007, the respondent called Judge Russell's Administrative Assistant to schedule a motion. That motion was scheduled for December 10, 2007. That hearing date had to be continued because the respondent forgot to file a motion or give notice to the plaintiff. The motion was rescheduled for January 9, 2008. On January 9, 2008, the plaintiff appeared, but the respondent did not. The respondent had failed again to file any motion.

j. On January 22, 2008, the respondent filed a motion for relief of judgment that was entered on July 18, 2006. Judge Russell denied this motion because the motion was filed eighteen (18) months after the judgment was entered and therefore the motion was not timely filed.

'9. The Disciplinary Administrator and the Respondent agree that the Respondent violated KRPC 1.1, 1.3 and 8.4(d).'

4

"12.    The respondent disputes that he violated the terms and conditions of the diversion agreement. Further, the respondent argues that he was denied due process of law in the termination of his participation in the attorney diversion program. The hearing panel concludes the respondent was not denied due process of law. Diversion is a privilege, not a right. Supreme Court Rule 203(d)(2)(vii) provides that if a respondent fails to complete the diversion program he may be terminated from the program and if termination occurs, traditional disciplinary procedures will resume. Here, the respondent agreed in his diversion agreement that if he failed to comply with its terms, the disciplinary administrator may report non-compliance to the review committee and the review committee may order that the matter be set for formal hearing. The respondent was informed by the disciplinary administrator that the review committee ordered the diversion to be revoked. Supreme Court Rule 203 was complied with. The hearing panel further concludes the respondent violated the terms and conditions of the diversion agreement and it is proper to accept the stipulations contained in the diversion agreement.

"DA11685

"13.    In 1998, the respondent drafted a will for F.T., naming R.T., F.T.'s son, as executor. On April 20, 2011, F.T. died. At the time of his death, F.T. had two living children, R.T. and a daughter, T.C. F.T.'s wife and a third child, B.C., predeceased F.T.

"14.    Following F.T.'s death, R.T. contacted the respondent regarding his father's estate. It was alleged that the respondent provided advice to R.T. regarding the probate of F.T.'s estate. After R.T. and T.C. could not agree on how to proceed, the respondent provided R.T. with a consent to the representation and a waiver of conflict of interest allowing the respondent to represent T.C. R.T. declined to sign the consent and waiver. Thereafter, R.T. retained Charles J. Andres. Mr. Andres represented R.T. in R.T.'s fiduciary capacity as executor of his father's estate.

"15.    On June 24, 2011, on behalf of T.C., the respondent filed a civil suit against R.T., seeking a restraining order and damages.

"16.    On June 28, 2011, Mr. Andres filed the probate case.

5

"17.     On July 12, 2011, Mr. Andres wrote to the respondent, in an attempt to address what he believed to be was the respondent's conflict of interest. The respondent did not respond to Mr. Andres' letter.

"18.     On June 25, 2012, the court entered a memorandum decision in the probate case, disqualifying the respondent from representing T.C. in *In the Matter of the Estate of F.T.* In that decision, the court found:

> '12. Based on the testimony of all the parties, the Court finds that Jarvis was acting as counsel for both parties. A conflict arose between the parties . . . Although there was no formal agreement or retainer paid by [R.T.], the conduct of Mr. Jarvis created an implied contract of representation between [R.T.] and Jarvis. When Jarvis realized there was a break down between the two heirs, he attempted to have [R.T.] waive the conflict with [T.C.] [R.T.] refused to do so. Therefore, Jarvis may not continue in the case.'

The court also found that the respondent's continued representation of T.C. would amount to a violation of KRPC 1.9.

"19.     On October 12, 2012, in the probate case, the court entered an order striking pleadings and disqualifying attorney for conflict of interest. In that order, the court stated:

> '1. The Court incorporates herein by reference its Memorandum Decision of June 25, 2012, disqualifying Mr. Jarvis as counsel for [T.C.] due to a conflict of interest.

> '2. Notice of the time and place of hearing has been sent out as required by law.

> '3. The allegations in the Motion are true and correct.

6

'4. The pleadings prepared by Mr. Jarvis on behalf of [T.C.]'s pleadings [*sic*] should be stricken for failure to comply with K.S.A. 60-211(b) for the following reasons:

A. Mr. Jarvis knew of the conflict of interest by preparing an informed consent document which was presented to [R.T.] by [T.C.] as required by Rule 1.9. If the party refused to execute the written informed consent, as in this case, the attorney is disqualified pursuant to Rule 1.9;

B. That Mr. Jarvis continued to represent [T.C.] after [R.T.]'s refusal to sign the informed consent document thereby causing unnecessary delay and needless increase in the cost of litigation pursuant to K.S.A. 60-211(b)(1);

C. That the Court in its June 25, 2012 Memoranda [*sic*] Decision stated, "As for the hardship now faced by [T.C.], [] Exhibit 1 and Exhibit 2 make it clear that [R.T.] and his counsel tried to resolve the conflict of interest issue before litigation on the issue. Jarvis stayed in the case with the permission of [T.C.]. Therefore the Court finds that [T.C.] proceeded fully aware of the hardship that might occur."

D. That the hearing on [R.T.]'s Motion to Strike the pleadings [*sic*] herein was continued to this date, September 2012. The Court takes judicial notice that Mr. Jarvis continues to represent [T.C.] in [the civil case]. The time for appeal of this Court's order of June 25, 2012, has lapsed. Neither Mr. Jarvis nor [T.C.] have provided any evidence why the pleadings should not be

7

stricken and it would cause undue hardship to [R.T.],
and the Estate, to be disadvantaged further by not
striking the pleadings that were filed with a known
conflict of interest.'

"20. On November 30, 2012, the court entered a memorandum opinion, disqualifying the respondent from representing T.C. in the civil suit. In the opinion, the court stated:

'To say that attorney Jarvis was disqualified in the Probate case but not in
a proceeding involving the circumstances, parties and subject matter of
the Probate case would be an absurd result. Defendant's motion to
disqualify attorney Jarvis from further participation in this case is
granted.'

"21. At the time the respondent filed the civil suit against R.T., seeking a restraining order and damages, the respondent was subject to the terms and conditions of the diversion agreement entered regarding the first two attorney disciplinary complaints described in this report. Paragraph 10(a) of the diversion agreement provided, 'In any legal action filed by the respondent he shall associate himself with Kansas Counsel.' The respondent failed to associate himself with Kansas counsel when he filed suit against R.T.

"22. Filing suit against R.T. without associating with an attorney amounted to a violation of the respondent's diversion agreement.

"DA11796

"23. L. David Stubbs, an Oklahoma attorney, retained the respondent to register a foreign judgment in Kansas. On August 26, 2011, the respondent registered the foreign judgment in the Johnson County District Court of Kansas.

8

"24.     At the time the respondent registered the foreign judgment, the respondent was subject to the terms and conditions of the diversion agreement entered regarding the first two attorney disciplinary complaints described in this report. Paragraph 10(a) of the diversion agreement provided, 'In any legal action filed by the respondent he shall associate himself with Kansas Counsel.' The respondent failed to associate himself with Kansas counsel when he registered the foreign judgment. [Footnote:  During the hearing on the formal complaint, the respondent testified that his understanding of 'associate' with counsel was different than the disciplinary administrator's understanding of that same term. The hearing panel finds that the respondent's argument in this regard is specious.]

"25.     Registering the foreign judgment without associating with an attorney amounted to a violation of the respondent's diversion agreement.

"DA11892

"26.     R.S. married I.S. They had three children, including C.S. Later, R.S. and I.S. divorced. After the divorce, I.S. continued to have a durable power of attorney for R.S.

"27.     R.S. owned and operated a successful insurance agency. For a period of more than 40 years, the respondent represented R.S. and his insurance agency. In 2008, C.S. purchased the insurance agency from his father.

"28.     Over time, R.S.'s mental health had deteriorated. He was evaluated by medical and mental health professionals multiple times.

"29.     On July 6, 2012, and August 2, 2012, R.S. was evaluated by two neurologists who provided reports of their findings. The neurologists diagnosed R.S. with frontotemporal dementia and found R.S. had significant atrophy of the cortex of both frontal lobes which was out of proportion to his age or other issues. Additionally, the neurologists found R.S. had very poor judgment and insight. As a result of the dementia, the neurologists concluded R.S. was no longer able to make medical, financial, or critical

9

life decisions of any kind, it was no longer safe for R.S. to drive a motor vehicle, and his condition was complicated due to grandiose and delusional thinking.

"30.    In their reports, the neurologists explained that there is no treatment for frontotemporal dementia, however, the neurologists proposed R.S. take certain medication to treat some of the symptoms.

"31.    On December 18, 2012, R.S.'s primary care physician provided a letter to I.S. regarding R.S.'s condition, which provided:

'[R.S.] is an 80 year-old with progressive cognitive decline over the past 2-3 years. His condition is consistent with progressive dementia. Earlier this year, he underwent neurological assessment by Dr. Vernon Rowe and subsequently by Dr. Dana Winegarner, both neurologists at the Mid-American Neuroscience Institute.

'Dr. Winegarner's conclusion is that [R.S.] suffers from frontotemporal dementia. His Montreal Cognitive Assessment Score is 15 indicative of significant cognitive impairment. She concluded that [R.S.] suffered "total inability" to make appropriate financial, medical, or critical life decisions due to poor insight and judgment.

'Additionally, she felt he was unable to safely drive. His poor memory and insight are further complicated by delusional and grandiose thinking. Based on my experience with [R.S.], I concur with her findings and recommendations. Her findings are outlined in detail in her 8-8-12 note which is part of [R.S.]'s medical record.

'[R.S.]'s condition is chronic and progressive. His cognitive function will likely continue to decline. I would recommend ongoing follow up by a psychiatrist given the degree of his deficit.'

10

"32.     The respondent formed Aida Oil, Inc. and served as its vice president, secretary, and treasurer. The company was named for the respondent's wife, Aida Jarvis. The respondent's brother, Mark C. Jarvis owned Aida Oil, Inc.

"33.     On March 28, 2013, the respondent prepared and R.S. executed a Promissory Demand Note to Aida Oil, Inc. in the amount of $25,000. The note was secured by property owned by R.S. in Paola, Kansas. Also on March 28, 2013, R.S. executed a Quit Claim Deed transferring the property which purported to secure the promissory note, to Aida Oil, Inc.

"34.     On March 29, 2013, Aida Oil, Inc. issued a check to R.S. in the amount of $25,000.

"35.     On April 15, 2013, on behalf of Aida Oil, Inc. and R.S., the respondent filed suit against C.S. and his wife, S.S., seeking partition of real estate, in Miami County District Court, case number 13CV80. The subject property in the suit brought by the respondent was the same property transferred by R.S. to Aida Oil, Inc. as security for the promissory note entered by R.S.

"36.     On May 12, 2013, Texas Life Insurance Company issued an endorsement to R.S.'s life insurance policy, changing the primary beneficiary to the respondent.

"37.     On May 17, 2013, I.S. and C.S. filed a petition to have a guardian and conservator appointed for R.S. Eldon Shields represented I.S. and C.S. in the guardianship and conservatorship case. That same day, the court issued temporary orders, including an order temporarily appointing Ron Wood as R.S.'s guardian and conservator.

"38.     On May 31, 2013, the respondent entered his appearance on behalf of R.S. in the guardianship and conservatorship case.

"39.     On June 7, 2013, the respondent filed a motion to terminate the appointment of Mr. Wood as the temporary guardian and conservator. Additionally, the respondent sought to have a voluntary conservator appointed. Later, the respondent filed a demand for a jury trial.

"40.    On June 18, 2013, the court conducted a hearing on the respondent's motion to terminate the appointment of Mr. Wood. The court denied the respondent's motion and Mr. Wood remained as R.S.'s temporary guardian and conservator.

"41.    On July 12, 2013, counsel for I.S. and C.S. filed a motion to disqualify the respondent from his representation of R.S. in the guardianship and conservatorship case.

"42.    On July 18, 2013, without authorization from Mr. Wood, R.S. signed a Kansas Quit-Claim Deed which purported to transfer title from R.S.'s company to 'The Boss/Saw Land Holding & Mgmt. Co., LLC.'

"43.    On July 26, 2013, more than a month after the court ordered that Mr. Wood would continue to serve as guardian and conservator for R.S., the respondent, without authorization of Mr. Wood, acting as counsel for R.S. and Bossaw Land Holding Mgmt. Co., LLC, filed a petition against I.S., C.S., and others seeking damages and eviction in the Wyandotte County District Court, case number 13LM4585.

"44.    On July 28, 2013, without authorization from Mr. Wood, S.W., R.S.'s sister, wrote to a tenant of a building owned by R.S.'s company. The letter was on Bossaw letterhead. S.W. notified the tenant that Bossaw was the new owner of the building and all rents would be collected by Bossaw.

"45.    On August 6, 2013, the court conducted a hearing on the motion to disqualify the respondent from the representation of R.S. At the conclusion of the hearing on August 6, 2013, the court allowed the parties to August 13, 2013, to file proposed findings of fact and conclusions of law. The filing of proposed findings of fact and conclusions of law was not required. The court ordered the parties to return on August 20, 2013, at 8:30a.m. for a ruling on the motion for disqualification.

12

"46.      On August 13, 2013, the petitioners filed proposed findings of fact and conclusions of law. The respondent did not file proposed findings of fact and conclusions of law.

"47.      On August 20, 2013, at 8:30a.m., the court commenced the hearing to rule on the motion to disqualify the respondent from his representation of R.S. At 8:30a.m., the respondent and R.S. were not present in the courtroom for the hearing.

"48.      During the hearing, the court disqualified the respondent from his representation of R.S. because the respondent had a pecuniary interest [in] the matter. Specifically, the court found the respondent had a pecuniary interest in R.S.'s conservatorship because the respondent had previously stated he had to find someone to loan R.S. money to pay the attorney fees owed to respondent. Further, the court found that the respondent circumvented the court's order appointing a temporary guardian and conservator when he filed suit on behalf of R.S. in Wyandotte County, Kansas, and when he organized Bossaw, Inc, for the purpose of collecting rents for R.S.

"49.      As the judge was completing the hearing, the respondent and R.S. appeared in the courtroom. The respondent informed the court that he and R.S. had arrived on time but had been in a different part of the courthouse.

"50.      After disqualifying the respondent as counsel for R.S. in the guardianship and conservatorship case, on August 21, 2013, Mike Jilka entered his appearance on behalf of R.S.

"51.      On August 27, 2013, counsel for I.S. and C.S. filed a motion to have the respondent, R.S., and others cited for contempt. Mr. Wood provided an affidavit in support of the petitioners' motion. The affidavit provided, in pertinent part, as follows:

'1. I am the temporary conservator and guardian for [R.S.] in this matter.

'2. I am serving in said capacity pursuant to the Court's Preliminary Orders.

'3. On June 18, 2013, the Court continued the Preliminary Orders and gave me the powers stated in K.S.A. 59-3075 and 59-3078 except for the power to place [R.S.] in any type of assisted living facility.

'4. I have received telephone calls from tenants of rental properties owned by [R.S.] and/or [R.S.'s company] stating that [the respondent, [R.S.], [S.W.], and [G.S.] are attempting to collect rent on behalf of Bossaw Land Holding & Mgmt. Co. LLC.

'5. I have reviewed the Petition in Wyandotte County Case No. 13LM4585 which attempts to evict tenants for not paying rent to Bossaw and purports to own property subject to my authority as guardian and conservator for [R.S.]

'6. I have been collecting rent from [R.S.]'s and [R.S.'s company]'s rental properties since I was appointed temporary guardian and conservator, and it is not in the best interest of [R.S.] to be selling real estate to Bossaw or to be evicting tenants.

'7. I did not authorize the sale of any real estate owned or effectively controlled by [R.S.].

'8. I did not authorize the filing of any lawsuit by [R.S.] or an entity owned or controlled by [R.S.].

'9. I did not authorize [R.S.]'s involvement in the creation of Bossaw Land Holding & Mgmt. Co. LLC.

14

'10. I have informed [the respondent], who has been acting as counsel for [R.S.], that [R.S.] is not authorized to be conducting business for himself or [R.S.'s company].

'11. The purpose of this affidavit is to support a finding that [the respondent], [R.S.], [S.W.], [G.S.], and Bossaw Land Holding Mgmt. Co. LLC are committing actions contrary to the Court's authority and contrary to my authority as guardian and conservator.'

"52. The respondent prepared a 'motion of the accused contemners,' for Mr. Jilka's signature. After receiving a copy of the motion from the respondent, on September 9, 2013, Mr. Jilka wrote to the respondent. Mr. Jilka stated:

'I just read the motion draft that you faxed me this afternoon. First, I note that you inserted my name on the pleading. Please be advised that our firm does not represent you. I have grave uncertainty and doubts regarding your position. If you decide to challenge the contempt citation at the hearing on September 13, I will not support your legal position. I have advised my client to cooperate with Mr. Wood.

'Second, I again urge you to dismiss Wyandotte County Case No. 13LM4585 and disband Bossaw Land Holding & Mgmt. Co., LLC in order to purge yourself from the contempt. In my opinion, the temporary conservator is authorized to act on behalf of [R.S.]. He has directed you to discontinue your actions that contravene his authority.

'Third, Mr. Boden contacted me earlier today to inquire if there was any interest in settling the contempt issues. I urge you to contact him and offer to follow the suggestions mentioned in the previous paragraph.

'I see no purpose in spending my client's money discussing the contempt motion with you any further because I do not represent you. I hope that you will heed my caution and contact Mr. Boden.'

15

"53.    Mr. Jilka arranged to have R.S. evaluated again. On October 1, 2013, a psychiatrist issued a report of his evaluation. The psychiatrist's report confirmed the earlier findings. The report contained the following statements:

'[R.S.] clearly experiences irreversible mental disease in the form of frontotemporal dementia . . . . So far, a trial of acetylcholinesterase medications was not helpful. This is a progressive disease.

. . . .

'With a functional intellectual level at the DSM-5 Severe Intellectual Disability level (DSM-IV-TR Moderate Mental Retardation) and a composite "IQ" at the 0.1 percentile (999 of 1000) persons function better than he, due to progressive frontotemporal dementia, [R.S.] cannot function independently in any financial dealing or in any independent decision-making about his person or medical care.

'Though he has very little insight into the progressive nature of his frontotemporal dementia, [R.S.] can define guardianship, can define conservatorship, and gives a reasonable indication that he would like assistance to manage his estate "of millions" or the liquidation of his estate. One on hand, he "believes" that he has no need for advice from anyone about anything, but actually relies very heavily on advice and guidance from his sisters, trust attorney Cheryl Bruska, his brother-in-law, and long-term legal advisor Mike Jarvis.'

"54.    During the time the respondent provided R.S. with legal counsel, he filed multiple suits on behalf of R.S., and formed Bossaw for R.S. All the while, the respondent was subject to the terms and conditions of the diversion agreement entered regarding the first two attorney disciplinary complaints described in this report. Paragraph 10(a) of the diversion agreement provided, 'In any legal action filed by the respondent he shall associate himself with Kansas Counsel.' The respondent failed to

16

associate himself with Kansas counsel when he provided R.S. with legal counsel, filed multiple suits on behalf of R.S., and formed Bossaw for R.S.

"55.     Providing R.S. with legal counsel, by filing multiple suits on behalf of R.S. and, additionally, forming Bossaw for R.S. without associating with an attorney amounted to additional violations of the respondent's diversion agreement.

"*Conclusions of Law*

"56.     Based upon the findings of fact, the hearing panel concludes as a matter of law that the respondent violated KRPC 1.1, KRPC 1.3, KRPC 1.7(a)(2), KRPC 1.8(e), KRPC 1.14(b), KRPC 8.4(c), and KRPC 8.4(d), as detailed below. [Footnote: Regarding DA11685, the disciplinary administrator did not provide clear and convincing evidence to establish a violation of KRPC 1.7 or KRPC 1.9. First, the hearing panel is not bound by decisions of the district court. Second, the respondent testified, and denied, having contact with R.T., as described in the formal complaint. No other testimony was presented to controvert the respondent on that subject. Accordingly, the hearing panel dismisses the allegations that the respondent violated KRPC 1.7 and KRPC 1.9 in DA11685. However, the hearing panel concludes, as detailed above, that the respondent violated his diversion agreement by filing suit against R.T. without first associating with counsel.]

"KRPC 1.1

"57.     Lawyers must provide competent representation to their clients. KRPC 1.1. 'Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.'

"58.     In the diversion agreement, the respondent stipulated that he violated KRPC 1.1. Accordingly, because the respondent failed to provide competent representation to B.A., the hearing panel concludes that the respondent violated KRPC 1.1 in his representation of B.A.

17

"KRPC 1.3

"59.      Attorneys must act with reasonable diligence and promptness in representing their clients. *See* KRPC 1.3.

"60.      Again, in the diversion agreement, the respondent stipulated that he violated KRPC 1.3 in his representation of B.A. Because the respondent failed to act with reasonable diligence and promptness in representing B.A., the hearing panel concludes that the respondent violated KRPC 1.3.

"KRPC 1.7

"61.      KRPC 1.7 provides:

'(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

. . . .

(2) there is a substantial risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.'

In this case, there was a substantial risk that the respondent's representation of R.S. would be materially limited by the respondent's responsibilities to another client, Aida Oil, Inc., a company named for the respondent's wife and owned by the respondent's brother. Nevertheless, the respondent assisted R.S. in deeding property to Aida Oil, Inc., in order to obtain a loan for R.S. to allow R.S. to pay the respondent's outstanding attorney fees. Accordingly, the hearing panel concludes that the respondent violated KRPC 1.7(a)(2).

"KRPC 1.8

"62.     Attorneys are not permitted to provide financial assistance to clients. See KRPC 1.8(e). Specifically, that rule provides:

'(e) A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation, except that:

(1) a lawyer may advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter; and

(2) a lawyer representing an indigent client may pay court costs and expenses of litigation on behalf of the client.'

In this case, the respondent provided financial assistance to R.S., in violation of KRPC 1.8(e), when he assisted R.S. in deeding property to Aida Oil, Inc., in order to obtain a loan of $25,000 from Aida Oil, Inc., for the purpose of paying the respondent's attorney fees. As a result, the hearing panel concludes that the respondent violated KRPC 1.8(e).

"KRPC 8.4(c).

"63.     'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' KRPC 8.4(c). The respondent engaged in conduct that involved dishonesty when he attempted to collect rents from R.S.'s tenants, on behalf of R.S., without consulting with Mr. Wood, R.S.'s duly appointed guardian and conservator. As such, the hearing panel concludes that the respondent violated KRPC 8.4(c).

19

"64.    'It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice.' KRPC 8.4(d).

"65.    In the diversion agreement, the respondent stipulated that he violated KRPC 8.4(d) in his representation of B.A. Thus, because the respondent engaged in conduct which was prejudicial to the administration of justice, the hearing panel concludes that the respondent violated KRPC 8.4(d) in his representation of B.A.

"66.    The respondent also violated KRPC 8.4(d) in his representation of R.S. It is important to consider the respondent's violation of KRPC 8.4(d) in light of KRPC 1.14(b). KRPC 1.14(b) provides:

> 'When the lawyer reasonably believes that the client has diminished capacity, is at risk of substantial physical, financial or other harm unless action is taken and cannot adequately act in the client's own interest, the lawyer may take reasonably necessary protective action, including consulting with individuals or entities that have the ability to take action to protect the client and, in appropriate cases, seeking the appointment of a guardian ad litem, conservator or guardian.'

The respondent knew that R.S.'s capacity was diminished and R.S. was at risk of harm, as the respondent had reviewed the evaluations of the neurologists. Despite this knowledge and the knowledge that the court had appointed Mr. Wood to serve as guardian and conservator for R.S., the respondent engaged in conduct that circumvented the court's order appointing Mr. Wood as R.S.'s guardian and conservator. Specifically, the respondent formed Bossaw for the purpose of collecting rents on behalf of R.S., without the authorization of Mr. Wood. Further, the respondent filed suit in Wyandotte County District Court, on behalf of R.S., after Mr. Wood had been appointed as guardian and conservator for R.S. The respondent's conduct in this regard is an egregious violation of KRPC 8.4(d).

20

"67. In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"68. *Duty Violated*. The respondent violated his duty to the public and to the legal profession to maintain his personal integrity and his duty to the legal system to comply with court orders.

"69. *Mental State*. The respondent knowingly and intentionally violated his duties.

"70. *Injury*. As a result of the respondent's misconduct, the respondent caused actual injury to the legal system.

"Aggravating and Mitigating Factors

"71. Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factor present:

"72. *Prior Disciplinary Offenses*. The respondent has been previously disciplined on four occasions.

"73 First, on March 4, 1994, the Kansas Supreme Court censured the respondent for having violated rule 1.5(f)(1), for entering into a contingency fee agreement in a divorce case.

21

"74.    Next, on May 11, 1998, a hearing panel of the Kansas Board for Discipline of Attorneys informally admonished the respondent for two violations. The respondent violated rule 5.3(b) for allowing a disbarred attorney, working as a legal assistant in the respondent's office, to meet with clients. Additionally, the respondent violated rule 1.15(c) for failing to retain funds in his trust account, when his client disputed how the funds should be disbursed.

"75.    Third, in November, 2007, the disciplinary administrator informally admonished the respondent for having violated KRPC 1.8(j).

"76.    Finally, in 2011, the review committee of the Kansas Board for Discipline of Attorneys approved the respondent's request to participate in the attorney diversion program for having violated KRPC 1.1, KRPC 1.3, and KRPC 8.4(d). See ¶¶ 8-11 above.

"77.    *A Pattern of Misconduct*. The respondent has engaged in a pattern of misconduct.

"78.    *Multiple Offenses*. The respondent committed multiple rule violations. The respondent violated KRPC 1.1, KRPC 1.3, KRPC 1.7(a)(2), KRPC 1.8(e), KRPC 8.4(c), and KRPC 8.4(d). Accordingly, the hearing panel concludes that the respondent committed multiple offenses.

"79.    *Refusal to Acknowledge Wrongful Nature of Conduct*. The respondent has refused to acknowledge that his conduct violated the Kansas Rules of Professional Conduct. Accordingly, the hearing panel concludes that the respondent refused to acknowledge the wrongful nature of his conduct.

"80.    *Vulnerability of Victim*. R.S. was vulnerable to the respondent's misconduct.

"81.    *Substantial Experience in the Practice of Law*. The Kansas Supreme Court admitted the respondent to practice law in the State of Kansas in 1969. At the time of the misconduct, the respondent has been practicing law for more than 40 years.

22

"82.    Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

"83.    *Personal or Emotional Problems if Such Misfortunes Have Contributed to Violation of the Kansas Rules of Professional Conduct*. During the past 13 years, the respondent has suffered significant medical problems. It appears that the respondent's medical condition contributed to his misconduct.

"84.    *Physical Disability*. In 2001, the respondent suffered a stroke. In 2006, the respondent suffered deep vein thrombosis with bilateral pulmonary embolism.

"85.    In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'4.32    Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client.'

'4.42    Suspension is generally appropriate when:

(a)  a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client; or

(b)  a lawyer engages in a pattern of neglect and causes injury or potential injury to a client.

'6.22    Suspension is appropriate when a lawyer knowingly violates a court order or rule, and there is injury or potential injury to a

23

client or a party, or interference or potential interference with a legal proceeding.

'7.2    Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.

'8.2    Suspension is generally appropriate when a lawyer has been reprimanded for the same or similar misconduct and engages in further acts of misconduct that cause injury or potential injury to a client, the public, the legal system, or the profession.'

"*Recommendation*

"86.    The disciplinary administrator recommended that the respondent be disbarred. The respondent recommended that he be suspended from the practice of law. The respondent further recommended that he be permitted to return to the practice of law after he has been cleared by medical professionals to resume the practice of law.

"87.    The hearing panel has carefully considered the misconduct committed by the respondent, in this case, along with the evidence of aggravating and mitigating circumstances. Based upon the findings of fact, conclusions of law, and the Standards listed above, the hearing panel unanimously recommends that the respondent be indefinitely suspended.

"88.    Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

24

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties; it determines whether violations of KRPC exist; and, if they do, it decides the discipline to be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2014 Kan. Ct. R. Annot. 363). Clear and convincing evidence is "'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

Respondent was given adequate notice of the formal complaint, to which he filed an answer, and adequate notice of the hearing before the panel and the hearing before this court. The respondent filed exceptions to the hearing panel's final hearing report. At oral arguments, the respondent conceded that his only objection to the final hearing report is that his due process rights were violated when the Review Committee summarily terminated his diversion and reinstituted formal disciplinary proceedings on complaints DA10466 and DA10620.

We express no opinion as to the merits of Jarvis' due process argument. For the purposes of this proceeding we will assume, without deciding, that due process does not permit discipline to be imposed for the KRPC violations arising from the conduct that was subject to those complaints. But we are more concerned with the KRPC violations that the panel found the respondent committed in his representation of R.S.

The conduct from which these violations arise was not subject to the diversion agreement. And the evidence before the hearing panel establishes by clear and convincing evidence the charged misconduct violated KRPC 1.7 (2014 Kan. Ct. R.

25

Annot. 531) (conflict of interest); 1.8 (2014 Kan. Ct. R. Annot. 542) (conflict of interest); 8.4(c) (2014 Kan. Ct. R. Annot. 680) (conduct involving dishonesty, fraud, deceit, or misrepresentation); and 8.4(d) (2014 Kan. Ct. R. Annot. 680) (conduct prejudicial to administration of justice). Moreover, the evidence supports the panel's conclusions of law. We adopt the panel's findings and conclusions.

The only remaining issue is determining the appropriate discipline for these violations. At the hearing before this court, the Disciplinary Administrator requested that the respondent be disbarred. The respondent requested that he be suspended for a period of several months to give him time recover from, and obtain clearance that he has recovered from, his past medical problems.

A majority of the court agrees with the hearing panel's recommendation that the respondent be indefinitely suspended from the practice of law. In particular, we agree with the hearing panel that the respondent's knowing, intentional disregard for the authority of the district court and of R.S.'s temporary guardian and conservator was egregious. The respondent asks the court to consider that his actions were rooted in his desire to protect R.S. While the respondent clearly disagreed with the district court that presided over R.S.'s guardianship and conservatorship proceedings, this is not a satisfactory explanation for the respondent's decision to disregard and actively undermine the district court's orders and to interfere with the temporary guardian and conservator's management of R.S.'s estate. The respondent's unwillingness to recognize or take responsibility for this misconduct further indicates that indefinite suspension is the appropriate sanction. A minority of the court would disbar the respondent.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that LAURENCE M. JARVIS be indefinitely suspended from the practice of law in the State of Kansas effective on the filing of this opinion. See Supreme Court Rule 203(a)(2) (2014 Kan. Ct. R. Annot. 306).

IT IS FURTHER ORDERED that the respondent shall comply with Supreme Court Rule 218 (2014 Kan. Ct. R. Annot. 414) and, in the event he files a petition for reinstatement, shall be subject to a reinstatement hearing under Rule 219 (2014 Kan. Ct. R. Annot. 415).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.

BILES, J., not participating.

GUNNAR A. SUNDBY, District Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** District Judge Sundby was appointed to hear case No. 112,511 vice Justice Biles under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution.